The next case is United States v. Watts. May it please the court. My name is Joe Ryan. I was the CGA lawyer appointed to represent Mr. Watts in the proceedings below. And my purpose here is to convince your honors that Mr. Watts was wrongfully convicted upon a manufactured crime that was never charged and never defended in this case. And you say, why? Mr. Watts was disembarking from a cruise ship with his wife and arrested on this indictment. He had never been interviewed, notified at all that this indictment would accuse him of engineering a pump and dump scheme. And as the proceedings evolved, in his pretrial motion he disclosed that I lost $15 million in this company. And I'm going to prove that to the jury. I have no intent to defraud investors. And when the government heard that motion, what did they do? They doubled down to convict him. Doubled down. They had no pump and dump scheme case. Their own witness never testified that we raised stocks to the high level of these worthless companies to defraud people and enrich ourselves. No such testimony. I have a second witness, Robert Clackman. He says, I never intended to defraud investors. That's the two chief prosecution witnesses. So when it came to summation, the government had to come to the realization that their so-called pump and dump scheme, which is specified in the indictment, is not going to make it. So what did they do? They said, he's guilty of all of these charges because of a consulting agreement, one of 700,000 documents given to the defense. And this is to wrongly and unlawfully release 262,000 restricted shares so they can be traded to the public. But the government knew from a legal opinion that brokerage firms relied upon that this was not a phony issuance of $262,000. The lawyers in Exhibit 79 said specifically that this was a sale of stock that Mr. Watts had that he bought from the company when he originally invested his $50 million. And he was selling it to Mr. Gleckman for consideration, because Mr. Gleckman, who was a $600,000 shareholder in the company, was obligated to attract investors for the next year. And he had every reason to do that, because if this company succeeded, he did too. He was a 600,000 share investor in this company. Isn't that, and please help me understand the record better, isn't that just your client's version of the facts, but the government's version of the facts was that the consulting arrangement was a means by which Mr. Max could be paid to effectuate the manipulation of the HECC stock? There is no question in this case that Mr. Watts sold the stock to Mr. Gleckman for the purpose of raising money, because this was in an oil crisis crisis and he didn't have the money. And Mr. Watts testified, we didn't have the money. I had stock, and it had value, okay? So Mr. Gleckman is going to take the stock, and he's going to sell it, and he's going to pay Max, because Max is saying, hey, I don't want your stock anymore. This stock is going down. Well, why isn't that from the government's, why wouldn't that mean, this is not a constructive amendment of the indictment. This is just the means by which the stock manipulation scheme was effectuated. You had to pay a co-conspirator. The stock manipulation in this case is Max Trades. You create fictional trades so that investing public says, hey, this is a hot company, okay? They had no evidence of that, no evidence of that. And Mr. Gleckman said, and he's the one who's selling the stock and paying Max's firm to continue the marketing. Gleckman says, this was not intended to defraud investors. I was selling the stock, okay, to get cash, because Max was demanding cash, because this stock was going down. And here we have an indictment that says that we're manipulating the stock up to defraud the investors. This is a company with $200 million in oil reserves and everything else, 130 wells and gallops in the base, a real company. A pump and dump scheme is a company with little or no value. And you're getting cooperators out there, buy the stock to raise the price up, so it's a falsely inflated price, and then you sell it, and you realize the proceeds. But not here. Their own evidence shows, and they admit, the stock was going down. But help me with this issue, Mr. Ron. If I were a juror, you would have my attention. But the jury heard your case, the jury heard the government's case, and found that he was guilty beyond a reasonable doubt. So what exactly is it you're asking us to do? Good question. The jury said, what do we have to determine? Judge-  What do we have to determine? We have this prosecutor who's saying that this 262,000 consulting room is a crime, it's a securities crime. The jury says, what do we have to determine? And what did the judge do? She says, reread my charge. Reread my charge? No answer. None. No guidance at all. And within an hour, they came back and they convicted Mr. Watts. What the prosecutor concedes is this argument was securities fraud. This argument that there's a consulting agreement that's supposed to be phony is a crime. You won't find that in the indictment. You can read this indictment from now until Closed Day. There's nothing about this consulting agreement being a securities fraud case. None. Can I ask you about the cross appeal? Could you just briefly explain why, your understanding as to why the district court varied downward by so much? Well, Judge Seibert realized that Mr. Watts was as much a victim of Mr. Matz, who's the real crook here. He's in Melville, New York, operating his boiler room. And she felt that the difference between the two, and this was an observation made by a juror at a note, that Mr. Watts made a very good impression on the stand and everything else, but he was nothing like Mr. Matz. So she compared that with Mr. Matz. And she could not find in her discretion that Mr. Watts deserved a sentence like Mr. Matz would receive when he's eventually sentenced. Because that's what the judge stated in the record, and that's when it's in our briefs, Judge. If there's no further questions, I'll save my time for rebuttal. Thank you very much. May it please the court. My name is Assistant United States Attorney Whitman Knapp, and I represented the government in the district court in this case. I'd like to start by just clearing up, I think, some of the allegations that were highlighted in an argument that Your Honors just heard. The notion that the government never alleged what it proved, that the defendant was not convicted of what he was charged with, is simply without basis. The charges are set forth very clearly in the indictment. The indictment, Paragraph 32, this is at Government Appendix Page 8, says, to compensate the boiler room and to facilitate the stock manipulation, the defendants provided the boiler room with shares from the manipulated public companies for free or at below market prices through stock purchases and consulting agreements, which is exactly what we showed. In Paragraph 33, we alleged that, thereafter, there was manipulative trading that took place that often deceived elderly purchasers. We proved that. What did the government allege and prove was Mr. Watts' participation in that specific activity? We showed two things. First, we show that Mr. Watts set up the agreements with Mr. Gleckman and with Mr. Matz that facilitated. One should bear in mind, Mr. Gleckman, the co-defendant who pleaded guilty and testified, was only a small part of the larger scheme. He was someone who facilitated payment from about late summer of 2015 until sometime in the fall of 2015. He allowed Mr. Watts to pay Mr. Matz for match trading and for supporting the stock. And he did that through these consulting agreements and also through false invoices. But there were other ways and more direct ways, quite frankly, that Mr. Watts participated in this. First, he met with Mr. Matz. This was in the summer of 2014 and heard an explanation of exactly what it was that Mr. This is the government's brief, and this is not what I'd ask you. I'd ask you what evidence the government induced that connected Mr. Watts with the, for want of a better word, vulnerable victims that you referenced in your brief. I think the most direct evidence that we had was the extensive evidence that we provided of the match trading. So, for example, the one that we cite in our brief, of course, quite a bit is the match trade that Mr. Watts conducted with a 94-year-old military veteran on Christmas Eve. And you will see in person or on the phone. What you see is there was phone calls between the boiler room and Mr. Watts and Mr. Watts' broker. And then there were trades. We don't have Mr. Watts directly speaking with any of these elderly victims, to get to Your Honor's point. What I would point out, however, is we did have one victim, a young man who lost $18,000, who had been spoken to directly by Mr. Watts. And he was someone who Mr. Watts had met through his church group. I think there's also circumstantial evidence that Mr. Watts would be aware of the nature of the sort of investor that would be reached out to. He had been to the boiler room on two occasions. We had multiple people who testified about that. He'd spoken with the cold callers at the boiler room. This type of scheme, unfortunately, and this type of victimization and who gets victimized by these, is not something that is rare. And certainly, as someone who had a lot of experience in the securities fraud industry that we did prove or show, Mr. Watts would not have been unaware of the types of people who would purchase stocks like this in this amount as a result of a boiler room reaching out to them. That's speculation. Do you have any more facts? As to the identity of those elderly victims, I do not, Your Honor. What was the evidence in the record about the direct exchange with the younger victim that lost what was in the neighborhood of $18,000? The evidence there was the younger victim testified himself. His name is Joshua Poston, that he had been reached out to by or had spoken with Mr. Watts who was something of a mentor to him. And he'd been given the purported opportunity to buy the shares of Hydrocarb from Mr. Watts directly, and he'd done so. What Mr. Watts did not tell him at that time, however, was that Mr. Watts was paying the boiler room money in order to inflate the price of the stock and also to inflate the trading value. It would make the value of or the appearance that there was a lot of interest in the stock and would create that type of selling point. He never told Mr. Poston, the younger victim, that. What I might also add, just to supplement my earlier answer where I said there was absolutely there was no other information about the age of the victims. We did provide evidence, and it is in the record at Government Appendix 280. It was a lengthy list of investors and very specific stock amounts. And I will concede, Your Honor, it did not have the investors' names associated with it. But it had amounts of stocks from a very large amount to a very small amount. At minimum, it would certainly, given the number of investors there, and that's evidence on the- No, I think it- To be clear, it does have their names, but it does not have their ages, to be clear. If one were to look at a list of investors that was that long, even though it doesn't specify their ages, although it does specify their names, certainly one would understand that any number of these victims would be older people. That's just speculation. That doesn't- I'm unimpressed with that. To my mind, that was a serious accusation that Mr. Wants was directly involved in fleecing elderly, vulnerable folks. And I've asked you to substantiate that, and I haven't heard much yet. Your Honor, I think that simply being a part of this hidden process, using documents that contain false information, freeing up shares that were not allowed to be freed up and used in order to pay a boiler room, there's so much evidence that Mr. Watts knew that this was part of a corrupt process. This issue, for me at least, ties into the correctness of the sentence. So that's what I'm trying to elicit from you. And if you have anything on that issue that's helpful to the government's position, I'd appreciate hearing it. And this is with regard to the sentence. If I could ask, Your Honor, just to repeat the question. I apologize. You've made an argument that this sentence is substantively unreasonable. The guidelines were sky high, and the district judge gave the defendant, in fact, a year. One of the allegations you made is the one . . . some of the facts you pointed out, the allegations you made, are the ones I've been asking you about. So I'm asking you again, are there facts in the record that tie Mr. Watts to misrepresentations and deceit involving vulnerable victims, other than the fact that he was in the room or he was in the building? As to the evidence that was presented at trial, no, Your Honor. As to the evidence that was presented in connection with sentencing, though, I think there is additional information. Some of that information is summarized in a letter that was submitted by FINRA to the court, and it talked about a number of customer complaints that had been made against the defendant, and then awards that had been issued against him. It also talked about a matter that had been instituted by the SEC. I believe it was in the year . . . What's the record site for that letter? Yes. That letter is at Government Appendix, I believe, 368 through 370, Your Honor. Thank you. That alleged that Mr. Watts and others had been involved in a scheme to defraud older investors through a company that he owned that was related to retirement savings, et cetera. That was a civil enforcement action by the SEC? It was a civil enforcement. In something like 2019, 2018? I believe it was 2018, Your Honor. And what's the status? It was ongoing. There are no real details in the FINRA letter. It remains ongoing, Your Honor. Now I can tell you just from checking up on this before, this is outside the record. I understand that the matter is on for a status conference or the presentation of a joint resolution this Friday, one or the other. On the sentence, I mean, the district court did consider the 3553 factors, and I'm just trying to understand from you, your brief, your presentation here, what was the abuse of discretion? I'm not quite clear what the argument is still. Sure. The abuse of discretion is that I would respectfully disagree with Your Honor that the 3553A factors were clearly articulated by the judge, and to the extent that they were, I think in places they were simply wrong. So let me just talk a little bit about that if I may. The major reason that the court cited was the defendant's likability, and that's not a 3553A factor. Another major reason was the importance of restitution in this case. And that's not something that is appropriate in as much as certainly the guidelines in their policy statement at Section 5H1.1 indicate that someone's socioeconomic status is not something that should be relevant to the determination of a sentence. I'm interested in the answer to Judge Park's question. Which of the 3553 factors in the government's view did the trial judge overlook, and which did it misapply, and what is the government's view that there was an abuse of discretion? Yeah. So the court overlooked, I think, the seriousness of the crime. How could the judge do that? The judge sat through the trial and read these letters about the consequences of the conduct of conviction? That's the case, but she articulated no reason why, after having heard all of these letters, that the sentence should be so very, very far below what the guidelines called for. She acknowledged the seriousness, and it was. It was health. It was people's entire retirement. It was their homes that they lost. It was an attempt to— Do you think the judge didn't understand that? Is that what you're telling me? I think that the judge did not articulate why, in light of— Which of the 3553 factors did the judge overlook, and which did she, in the government's view, misapply, and how did this amount, in the government's view, to an abuse of discretion? So I think that the court overlooked the seriousness of the—excuse me. I think the court got the seriousness of the offense wrong. I don't think that she understood— She did not explain why, in light of everything that was presented to the court, a sentence that was so far below the guidelines was appropriate in this case. She cited restitution, and I've spoken a little bit about that and why that is not an appropriate governing consideration here. In fact, even if it were something to be appropriate as such a consideration, there's no evidence in the record that the defendant could, in fact, pay the restitution. The PSR at paragraph 156, that's page 44, cited that the defendant's monthly cash flow is only $153. Additionally, if the theory that restitution takes primacy and therefore a shortened period of custody is appropriate, the court, without any motion from the defendant or the government, released the defendant until the determination of this appeal. And in that period of more than a year, after she ordered him to pay restitution to the victims, not one penny of restitution has been paid. Not one penny of forfeiture has been paid. Your adversary this morning says that she was moved by the estimation that the culpability of Mr. Matz, who actually ran the boiler room, was substantially greater than the culpability of the defendant here. Certainly the court is entitled to assess the culpability of different defendants. What I would note is that Mr. Matz pled guilty very quickly and took responsibility very quickly. He testified at two trials against co-defendants, Mr. Watz, and then two other co-defendants who went to trial. And what I would also argue or simply highlight for the court is that there were other people involved in the boiler room who had been sentenced by this court. I addressed that in the brief, so I won't repeat that. But they had received sentences of 10 years and then other terms of years that were significantly in excess of the sentence that the court imposed upon Mr. Watz. And were those people that worked in the boiler room? They were people who worked in the boiler room. The two people who have received 10-year sentences were one of the two people, so someone who had an equal position to Mr. Matz in running the boiler room, and also someone who was a high-level what's called account executive at that boiler room. It has been our position that the corporate insiders, the people who are using these boiler rooms to unload their stock on victims like this, are more serious offenders than those other people. The court— And why is that? Because if there were not offenders—excuse me, I'm sorry. If there were not people who were essentially getting rid of this stock, creating this opportunity to push the stock, there would be no marketplace for a boiler room to even exist. There would be no profit or business in it. Let me also add that just about two weeks ago, so this is not in the record, one of the other co-defendants, also an insider, Jeffrey Chartier, was sentenced by the court. He was sentenced to a period of 10 years. One of the 3553A factors that the court did not directly address, and to the extent that there was some reference to it, I think that the court simply didn't provide an explanation to, was the characteristics of the defendant. One of the things that was striking throughout the sentencing proceeding, as well as trial, is that the defendant here expressed no remorse in his sentencing letter that Your Honors can read. And then later, in particular, in his statement to the court, he claimed that the testimony against him was false. He claimed that, incorrectly, that the prosecution had been unwilling to speak with him. He falsely stated he had no idea who his co-defendants were when he was indicted. He said that he understood the victims essentially because he himself was a victim. He said, and I'm quoting, if you add up all the money the victims lost, I lost four times that. All right? There was simply no rationale. If he believed he was innocent or mistreated by the government, why wasn't he entitled to maintain that position? He certainly was entitled to maintain that position. And yet, at trial and at sentencing, the government has provided evidence that's been subject to cross-examination that caused him to be convicted. And it caused his co-defendants to be convicted as well. So he is certainly entitled to take this position. But it's your position that if he does, it should count against him at sentencing? I think that it's appropriate for it to do so, Your Honor. He chose not to? Was that an abuse of discretion? To have varied this much from the sentence that was recommended, to have varied and imposed such a low sentence in light of the devastation that his crimes caused and the nature of the crimes caused, without explaining why I do think is an abuse of discretion. It should be clear here, the defendant was not at any time mistreated by the government. He was offered the opportunity to come in. The government provided a lengthy reverse proffer with a tabbed binder with hot documents in January of 2019. We'll take your representation that the government treated him well. Thank you, we will hear rebuttal. One fact that is common throughout this case is that they were all victims. This was the worst oil crisis in modern history. When they talk about a victim, that victim is in the same position as Mr. Watts. Now, Your Honor did a very thorough examination of the government as to what evidence there was of Mr. Watts dealing with these investors. And the answer is none, absolutely none. But they did mention Josh Poston. Josh Poston, if you read the transcript, he was an assistant of Mr. Watts. And he would accompany Mr. Watts as he went to these various marketing firms trying to attract interest in this company. Josh Poston didn't lose $18,000 because of Mr. Watts. He lost it like everybody else. This stock was going down to the point that Hydrocarb had to file for bankruptcy. So citing Josh Poston, it turns out Josh Poston asked him, I'd like to start my own company, Mr. Watts. Sure, I'll take it out of my pension fund. Here's $200,000, Mr. Poston. Go ahead, good luck with your company. And he did. This is the kind of victim that the government was trying to compress this court with? Now, there's been a lot of questions about what was the proof of Mr. Watts' guilt. What they haven't mentioned is proof of his innocence. They had a chart that suggested that Mr. Watts pocketed $561,000 as a result of all of these stock sales and disbursements. And they put an FBI agent forensic expert on the stand. Well, the expert wasn't asked to trace where the money went from the stock brokerage accounts. And there was a dramatic moment in the courtroom when the agent said, well, I need my work papers. Fine, the prosecutor brought the work papers up. I need a pencil, I'll give you two. I need a calculator. Prosecutor gives him a calculator. He sits down in front of the jury, and it took about five minutes. He says, Mr. Watts deposited directly into the hydrocarbon company bank account $994,000. That's evidence of fraud? That he's trying to pocket money at the expense of these victims? That's what this case is all about. And we implore your honors to give it the attention it deserves, because the due process clause should never let this happen. Thank you very much. Thank you both. Yes, we take the matter under advisement. And that is the last case to be argued this morning, so I'll ask the deputy to adjourn court. The court's name is Aaron. Thank you.